# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs December 7, 2011

## STATE OF TENNESSEE v. PATRICK WAYNE CARTER

**Appeal from the Criminal Court for Macon County**
**No. 08-CR-97      Dee David Gay, Judge**

**No. M2011-00097-CCA-R3-CD - Filed June 29, 2012**

The Defendant, Patrick Wayne Carter, appeals from the trial court's revocation of his probation and order that he serve the remainder of his sentence in confinement. The Defendant contends that the evidence was insufficient to sustain the revocation of his probation. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

Comer L. Donnell, District Public Defender; and Thomas H. Bilbrey, Assistant Public Defender, for the appellant, Patrick Wayne Carter.

Robert E. Cooper, Attorney General and Reporter; Meredith DeVault, Senior Counsel; Tom P. Thompson, Jr., District Attorney General; and Jason Lee Lawson, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

On May 25, 2010, the Defendant pled guilty to one count of selling a Schedule II controlled substance, a Class C felony, and one count of selling a Schedule III controlled substance, a Class D felony. See Tenn. Code Ann. § 39-17-417. The Defendant received an effective ten-year sentence to be served on probation. On August 17, 2010, a probation violation warrant was issued for the Defendant. The warrant alleged that the Defendant violated the terms and conditions of his probation by (1) committing two new offenses; (2) failing to report his arrest and new charges to his probation officer; and (3) using an intoxicant. The Defendant was subsequently arrested, and the trial court held a revocation hearing on September 23, 2010.

At the revocation hearing, the Defendant's probation officer, Tammy Wright, testified that on August 13, 2010, the Defendant was arrested and charged with one count of driving under the influence (DUI) and one count of disorderly conduct. See Tenn. Code Ann. §§ 39-17-305, 55-10-401. Ms. Wright testified that she learned about the Defendant's arrest by checking the arrest records at the Macon County Sheriff's Department (MCSD). According to Ms. Wright, the Defendant never contacted her to inform her about his arrest. Ms. Wright testified that the Defendant was scheduled to meet her on August 17, 2010. The Defendant called and spoke with Ms. Wright that day, but it was after the revocation warrant had been issued. The Defendant "just said that he needed to talk to [her] and [she] told him to come in." The Defendant was arrested on the revocation warrant before he could meet with Ms. Wright.

Sergeant Ron Smith of the MCSD testified that around 6:00 p.m. on August 13, 2010, he was going to assist another officer at an accident scene when he saw the Defendant's vehicle traveling from the direction of a "beer joint" called the Little Tavern. As the Defendant's vehicle neared Sgt. Smith, the Defendant crossed over the double yellow lines and into Sgt. Smith's lane of traffic before swerving back into the correct lane. Sgt. Smith turned his vehicle around, activated his emergency lights and siren, and pursued the Defendant in order to pull him over. Sgt. Smith testified that once he turned his car around, the Defendant was gone "like a cloud of dust." Sgt. Smith further testified that he had to travel "[w]ell above" the speed limit in order to catch up to the Defendant. Despite Sgt. Smith's emergency lights and siren being activated, the Defendant turned onto another road and traveled "another 200 yards" before eventually pulling into "a driveway in between a home and a barn."

Sgt. Smith testified that he ordered the Defendant to stay in the car but that the Defendant "immediately open[ed] the door and [spun] out" of the car. The Defendant was "kind of holding on to the car" to steady himself. Sgt. Smith testified that he could smell alcohol on the Defendant's breath, that he noticed the Defendant's eyes were bloodshot, and that the Defendant's speech was slurred. Sgt. Smith asked the Defendant how much alcohol he had to drink that day. The Defendant responded that he was not drunk and that he did not have anything to drink that day. Sgt. Smith brought the Defendant around to the back of the car to frisk him. Sgt. Smith testified that the Defendant swayed as he walked and had to hold onto the car to keep his balance. Sgt. Smith again asked the Defendant how much he had to drink and the Defendant "just went off."

As Sgt. Smith frisked the Defendant, the Defendant stuck his buttocks out and asked if Sgt. Smith was going to "f--k [him] in the ass." Sgt. Smith asked the Defendant to be still and the Defendant responded "[w]on't you just put it [in] my ass." The Defendant also told Sgt. Smith to "just go ahead and take [him] to jail" if Sgt. Smith thought he was drunk. Sgt.

Smith put handcuffs on the Defendant and told him that he was under arrest for DUI. The Defendant then told Sgt. Smith that he was "fixing to have a problem on [his] hands. F-U [sic]." Sgt. Smith testified that from that point on the Defendant was "constantly badgering and belligerent."

Sgt. Smith attempted to get the Defendant into the backseat of his patrol car. Sgt. Smith testified that the Defendant was "unsteady" and that he had to hold the Defendant up. The Defendant told Sgt. Smith that he would have to shoot him before he would get in the back of his patrol car. Sgt. Smith testified that he could not get the Defendant into the backseat by himself because the Defendant was "trying to get up in [his] face." Sgt. Smith had to have his partner assist him in getting the Defendant into the patrol car and that they had to "physically place [the Defendant] in the car more than once." The Defendant continued his belligerent behavior as Sgt. Smith drove him to the jail. The Defendant "was spitting on the back of the cage" and told the deputies that he "would burn [their] houses and bite [their] throats out."

Sgt. Smith testified that he arrested the Defendant for DUI without performing any field sobriety tests or asking the Defendant to submit to a blood or breath alcohol test. Sgt. Smith explained that he felt the Defendant "was a danger to himself and the officer[s]." Sgt. Smith further explained that he had probable cause to arrest the Defendant for DUI because the Defendant smelled of alcohol, had blood shot eyes, his speech was slurred, he had to hold on to the car to stand up, and he "was swaying back and forth." Sgt. Smith testified that he found "empty beer containers" and "empty brown sacks" used to hold large beer bottles inside the Defendant's car. Sgt. Smith also testified that he had been with the MCSD for over nine years and that he had made numerous DUI arrests.

Detective Matt Looper of the MCSD testified that on August 13, 2010, he was a Sheriff's Deputy and with Sgt. Smith when they spotted the Defendant's vehicle. Detective Looper corroborated Sgt. Smith's testimony about the Defendant's driving and his actions after he exited the vehicle. Detective Looper testified that when they exited the car he focused on the passenger in the Defendant's vehicle. According to Detective Looper, the passenger had a beer bottle in his hand when he exited the vehicle. Detective Looper testified that the passenger was "slow to respond to [his] commands," that he had "a hard time standing up," and that he "was kind of staggering around." Detective Looper arrested the passenger for public intoxication and disorderly conduct.

Detective Looper testified that he placed the passenger in the backseat of the patrol car and then assisted Sgt. Smith in getting the Defendant into the patrol car. Detective Looper concluded that the Defendant was "very intoxicated" because the Defendant's "speech was slurred, he smelled a strong odor of alcoholic beverage coming from his person,

he had difficulty controlling his balance, he was getting really loud, [and] he was really really abusive and obnoxious." Detective Looper also testified that the Defendant "bang[ed] his head on the screen" as they took him to jail. Detective Looper testified that he had made over 100 DUI arrests in his career and that in his opinion, the Defendant's behavior was "absolutely" consistent with that of an intoxicated person.

Sergeant Tony Law of the MCSD testified that he was on duty on August 13, 2010, when the Defendant was brought to the jail. Sgt. Law testified that he believed the Defendant was intoxicated because he was "pretty unsteady on his feet," he was uncooperative, and his speech was slurred. Sgt. Law testified that the Defendant was placed in the "drunk tank" that night.

David Mark Davis testified that he was in the Defendant's car when the incident occurred on August 13, 2010. According to Mr. Davis, he had been "driving around" with a friend when their vehicle had "broke[n] down." Mr. Davis testified that he called the Defendant and had the Defendant meet him at the Little Tavern. Mr. Davis further testified that the Defendant did not enter the Little Tavern. Instead, Mr. Davis met the Defendant in the parking lot of the bar. According to Mr. Davis, as they were driving they saw "a piece of metal" in the road. Mr. Davis testified that the Defendant tried to avoid the object by swerving into the opposing lane of traffic. However, the Defendant "swerved back" into his lane when he saw a car coming. Mr. Davis testified that they hit the object and that "it nicked the wheel up on top." Mr. Davis further testified that shortly after this the deputies "turned around and stopped [them]."

According to Mr. Davis, one of the deputies approached him and told him to "raise" his hands. When Mr. Davis asked why, the deputy said that he was going to arrest Mr. Davis. Mr. Davis testified that he "opened the door, got out, and took directions." Mr. Davis also testified that the Defendant "was cooperating with [Sgt. Smith]." However, Mr. Davis admitted that he could not really see what was going on because he can only see out of one eye and was in the backseat of the patrol car. Mr. Davis admitted that he "struggled" with Detective Looper "a little bit" and that he ultimately pled guilty to disorderly conduct. On cross-examination, Mr. Davis stated that he could not remember if he had a beer bottle in his hand when he got out of the vehicle. Mr. Davis also stated that he did not tell the deputies about the metal object in the road.

Mr. Davis testified that he did not drink alcohol and that he had not consumed or bought any alcohol that day. Mr. Davis admitted that he used to drink "[i]n times past" and that he was charged with public intoxication as a result of the stop. Mr. Davis explained that the public intoxication charge was dismissed because he "wasn't the driver." Mr. Davis testified that the Defendant did not have any alcoholic beverages in his car and that he did

not see the Defendant drink anything that day. Mr. Davis also testified that he did not smell any alcohol on the Defendant. However, on cross-examination, Mr. Davis admitted that he could not smell anything and that the Defendant "could have been loaded" and he would not have smelled it.

The Defendant testified that around 4:00 p.m. on August 13, 2010, he injured his ankle moving a motorcycle. The Defendant stated that he took a Xanax and a Hydrocodone that afternoon. The Defendant testified that he received a phone call from Mr. Davis asking the Defendant to pick him up at the Little Tavern. According to the Defendant, his ankle was too swollen for him to get his shoes on, so he left to pickup Mr. Davis barefoot. The Defendant denied that drugs he had taken earlier had any effect on his driving. The Defendant denied having any alcohol to drink that day. The Defendant also denied that he bought any beer at the Little Tavern and stated that he did not enter the bar.

The Defendant testified that as he was driving Mr. Davis home, he noticed a piece of "metal or plastic" in the road and that he swerved to try to avoid it. The Defendant also testified that he was not speeding and that the only reason he did not stop immediately for the deputies was because he did not see a safe place to pull over. According to the Defendant, Sgt. Smith approached him after he stopped the car and "the first thing" Sgt. Smith said was that the Defendant was "under arrest for DUI." The Defendant testified that Sgt. Smith did not tell him why he had been stopped, did not ask for his driver's license, did not ask him to submit to any field sobriety tests, and did not ask him to submit to a blood or breath alcohol test. The Defendant told Sgt. Smith that he had not had anything to drink that day, but he testified that Sgt. Smith "didn't want to hear no talk" and arrested him "as quick as possible." The Defendant claimed that he was unsteady on his feet because he was walking barefoot on a gravel driveway and because he had injured his ankle.

The Defendant admitted that after he was placed in handcuffs he "got belligerent." The Defendant testified that he agreed with Sgt. Smith and Detective Looper's testimony about his belligerent behavior. The Defendant explained that he was upset because the deputies did not give him an opportunity to explain himself and he felt like his "life was really over." The Defendant admitted that he was "probably" guilty of disorderly conduct and that he "guess[ed]" that amounted to a violation of the rules of his probation.

The Defendant admitted that he should have called his probation officer on her cell phone the night he was arrested, but he did not. Instead, the Defendant thought that since he had an appointment scheduled with his probation officer he would "just go in and talk to her." The Defendant also testified that he "was aiming to call her Monday," but his friends told him that was "going to jail" and that "sort of put [him] into shock." The Defendant claimed that he called and left a message for his probation officer sometime before August

17, 2010, stating that he "was coming in" and that he "really needed to talk to her." However, the Defendant admitted that he did not say anything in the message about his arrest. The Defendant also testified that he called his probation officer on August 17, 2010, and told her that he was coming in, but that he again did not mention his arrest. The Defendant admitted that he was supposed to report any arrest "immediately" and that he "probably broke that rule." Ms. Wright testified in rebuttal that she checked both her office and cell phones for messages from the Defendant before she filed the probation revocation warrant. Ms. Wright testified that the Defendant did not leave her any messages between August 13 and August 17, 2010.

Rachel Cornell testified that she was the "jail nurse" on August 13, 2010. Ms. Cornell testified that the Defendant was "limping a little bit" and that his ankle "was swollen and red and tender to the touch." Ms. Cornell also testified that she did not smell any alcohol on the Defendant.

Based upon the foregoing evidence, the trial court revoked the Defendant's probation and ordered him to serve the remainder of his ten-year sentence in confinement. The trial court accredited the testimony of Ms. Wright, Sgt. Smith, and Detective Looper over the testimony of Mr. Davis and the Defendant. The trial court found that Mr. Davis and the Defendant were not credible witnesses. The trial court concluded that the State had established by a preponderance of the evidence that the Defendant had committed a DUI and used an intoxicant in violation of the rules of his probation. Additionally, the trial court noted that the Defendant admitted that he committed the offense of disorderly conduct and that this also constituted a violation of the rules of his probation. The trial court also concluded that the Defendant lied under oath when he "[made] up an excuse that [he] called" Ms. Wright when he actually did not.

## ANALYSIS

The Defendant contends that the evidence was insufficient to sustain the revocation of his probation. The Defendant argues that the State failed to establish that he committed a DUI because there was not blood or breath alcohol test administered and because the deputies did not administer any field sobriety tests. The Defendant also argues that his conduct was "not nice," but that it did not "arise to a violation of [the] law or the rules of probation." The Defendant further argues that his plan to see his probation officer on August 17, 2010, constituted "substantial compliance" with the rules of his probation. The State responds that the Defendant admitted that he committed the offense of disorderly conduct and that a preponderance of the evidence established that he committed the offense of DUI. The State further responds that the Defendant failed to immediately report his arrest and

never reported his arrest to his probation officer prior to the issuance of the revocation warrant.

A trial court may revoke a sentence of probation upon finding by a preponderance of the evidence that the defendant has violated the conditions of his release. Tenn. Code Ann. § 40-35-311(e). A trial court is not required to find that a violation of probation occurred beyond a reasonable doubt. Stamps v. State, 614 S.W.2d 71, 73 (Tenn. Crim. App. 1980). "The evidence need only show [that the trial court] has exercised conscientious judgment in making the decision rather than acting arbitrarily." Id. Upon finding by a preponderance of the evidence that a defendant has violated the conditions of his release, the trial court "shall have the right . . . to revoke the probation and suspension of sentence" and either "commence the execution of the judgment as originally entered" or "[r]esentence the defendant for the remainder of the unexpired term to any community-based alternative to incarceration." Tenn. Code Ann. § 40-35-311(e) (emphasis added).

In a probation revocation hearing, the credibility of the witnesses is determined by the trial court. State v. Mitchell, 810 S.W.2d 733, 735 (Tenn. Crim. App. 1991). In reviewing the trial court's finding, it is our obligation to examine the record and determine whether the trial court has exercised a conscientious, rather than an arbitrary, judgment. Id. An arbitrary judgment "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" State v. Shaffer, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting State v. Moore, 6 S.W.3d 235, 242 (Tenn. 1999)).

Criminal conduct that is the basis of pending charges may serve as the basis for a revocation of a community corrections sentence. State v. Andrew B. Edwards, No. W1999-01095-CCA-R3-CD, 2000 WL 705309, at *3 (Tenn. Crim. App. May 26, 2000), perm. app. denied, (Tenn. Sep. 11, 2000). However, the trial court cannot rely solely on the mere fact of an arrest or an indictment. Id. Instead, the State must provide evidence "in order to establish the . . . commission of another offense." Id. Put another way, the State must produce evidence "to establish that the defendant committed the offense with which he has been charged." State v. Lontrell Williams, No. W2009-00275-CCA-R3-CD, 2009 WL 3518171, at *3 (Tenn. Crim. App. Oct. 30, 2009).

We begin by noting that the Defendant admitted that he committed the offense of disorderly conduct and agreed that Sgt. Smith and Detective Looper's testimony accurately described his belligerent behavior during the traffic stop. This alone was sufficient evidence of a probation violation to justify the trial court's revocation order. With respect to the DUI charge, the Defendant's main argument is that the deputies failed to perform any field sobriety tests or a blood or breath alcohol test. However, this court has previously held that,

a police officer's testimony, by itself, is sufficient evidence to convict a defendant of DUI. See State v. Vasser, 870 S.W.2d 543, 544 (Tenn. Crim. App. 1993) (stating that the State did not need more than the deputy's testimony to prove its DUI case).

Here, the deputies testified that they observed the Defendant's car cross into the opposite lane of traffic, that he was traveling well in excess of the speed limit, that he did not immediately stop despite the fact that the patrol car's emergency lights and siren were activated, and that the Defendant ignored Sgt. Smith's orders to remain in the car. Once the Defendant exited the vehicle, he had to hold on to the vehicle to maintain his balance. Sgt. Smith testified that the Defendant smelled of alcohol, had bloodshot eyes, his speech was slurred, and he was unsteady walking to the back of the car. Empty beer bottles were found in the Defendant's car, and Mr. Davis exited the car with a beer bottle in his hand. The Defendant also was extremely belligerent with the deputies. Additionally, the Defendant admitted to taking a Xanax and a Hydrocodone prior to driving. Accordingly, we conclude that the State established by more than a preponderance of the evidence that the Defendant committed the offense of DUI and used an intoxicant in violation of the rules of his probation.

With respect to the Defendant's failure to inform his probation officer about his arrest, the Defendant admitted that he did not immediately contact his probation officer and that he "probably broke that rule." Ms. Wright testified that the Defendant did not contact her until after the revocation warrant had been filed, and even then he did not mention his arrest. The record clearly establishes that the Defendant violated the terms of his probation by failing to contact Ms. Wright about his arrest. Because the State was able to prove each of the alleged violations by a preponderance of the evidence, we conclude that the trial court did not abuse its discretion by revoking the Defendant's probation and ordering his original sentence into execution. Accordingly, we affirm the judgment of the trial court.

<u>CONCLUSION</u>

Upon consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

-8-